(12 Misc. Rep. 223.)

### In re HARRIS.

(Supreme Court, Special Term, Schoharie County. April. 1895.)

1. PUBLIC LANDS—REFUNDING PURCHASE MONEY—LIMITATION.
    Under 1 Rev. St. p. 198, § 6, providing that, on failure of title to land granted by the state, the purchase money shall be repaid on the warrant of the comptroller, the statute of limitation against such claim does not begin to run, if at all, until the decision of the comptroller setting aside the sale.

2. SAME—ASSIGNEE OF PURCHASER.
    1 Rev. St. p. 198, § 6, providing that whenever the title to lands granted by the state shall fail, and a legal claim for compensation on account of

such failure shall be preferred by any person entitled thereto, it shall be the duty of the commissioners of the land office to direct the payment of the original purchase moneys which may have been paid to the state by "such person," includes the assignee of a purchaser, and is not, by the use of the words "such person," restricted to the purchaser.

8. SAME—REFUSAL OF CLAIM—MINISTERIAL ACT.
   The refusal of the commissioners of the land office to order the repayment of the purchase money in such case is a ministerial act.

Application by Peter Harris for a writ of mandamus to compel the commissioners of the land office to make an order for the refunding of certain money. Peremptory mandamus granted.

Z. S. Westbrook, for the motion.

T. E. Hancock, Atty. Gen., and W. E. Kisselburgh, Dep. Atty. Gen., opposed.

MAYHAM, J. Prior to the 1st day of February, 1882, the state had purchased the land in question on this application on various tax sales; and on that day the state, by the state engineer and surveyor, acting in the usual way, under and pursuant to resolution of, and by authority and direction of, the commissioners of the land office, sold to J. W. Finch such lands, and on such sale gave him a certificate of sale which contained the following statement:

"That J. W. Finch, of Glens Falls, Warren county, N. Y., pursuant to a resolution of the commissioners of the land office passed July 14th, 1881, this day purchased all the interest of the the people of the state of New York in that certain piece or parcel of land distinguished as lot eight (8), subdivisions 4, 5, 6, 7, 8, 9, and 10, Palmer's purchase, general allotment, Hamilton county, containing 100 acres each, as the same lot has been surveyed and described in the field book and map of said lands filed in the office of the secretary of state, containing in all 700 acres of land, upon which the sum of $6,300 is fully paid."

This sum Finch paid into the state treasury, and took therefor the usual and proper receipt of the comptroller and state treasurer, dated February 2, 1882. No deed or patent was ever given by the state to Finch, nor does it appear that any was ever demanded by him. On the 15th of December, 1884, Finch sold and transferred the certificate of sale received by him from the state engineer and surveyor to Peter Harris, the relator, and indorsed thereon the following written transfer or assignment: "For value received, I hereby sell, assign, and convey to Peter Harris the within certificate and contract, and all my right, title, and interest of, to, and in the lands therein mentioned." It also appears. That at the time of the purchase of these lands by Finch of the state, and the receipt of the state engineer's certificate therefor, the comptroller assigned to him the certificates of tax sales under which the state claimed title, and Finch, on assigning to the relator, also assigned such certificates of tax sales to him. After the purchase by the relator of the certificate of sale from Finch, and the assignment to him of the comptroller's certificates of tax sales to the state, Harris, the relator, claimed to have discovered that the tax sales to the state were irregular and void; and he thereupon presented his application to the comptroller, under the provisions of chapter 448 of the

Laws of 1885, to have the tax sales under which the state claimed title, together with the sales of these lands under the certificates to Finch, of which he was the assignee, set aside and canceled; and such proceedings were had under and pursuant to such application that on the 29th day of March, 1892, the comptroller made his order and determination, in and by which he canceled, annulled, and set aside, as wholly illegal, null, and void, the tax sales and certificates thereof, and each of them, and all the right, title, and interest which the people of the state of New York had, and ever had or acquired therein, in or to said lands. On the 28th of November, 1892, the comptroller refunded to the relator the sum of $398.29, represented by the tax-sale certificates of 1881, with interest on the same. That such tax, at the time of the sale, was $244.37, which, deducted from the price paid by Finch, left in the possession of the state, which the relator claims should be paid to him, the sum of $6,055.63, which he claims, with interest. On the above facts, the relator, by his attorney, applied in writing to the commissioners of the land office for refunding to him the amount due by reason of the failure of the title of the state to the lands, and accompanied such application with a release of all claims against the state by reason of such failure, on the refunding of such amount; and the commissioners of the land office refused to refund the same, or to make an order therefor; and the relator thereupon applies for a writ of peremptory mandamus to compel the commissioners of the land office to make an order for the refunding of such money to him.

It is objected, among other things, on the part of the respondents: First, that the claim of the relator, as against the state, through the commissioners of the land office, is barred by the statute of limitations; second, that the claim, if any exists, must be prosecuted by Finch, who paid the money, and cannot be enforced by his assignee, and that the relator, therefore, has no standing in court to enforce this claim; third, that the commissioners of the land office, in passing upon the claim for refunding, acted judicially, and the court, on an application for mandamus, cannot review or reverse their determination.

In determining the question of the statute of limitations, assuming that the statute runs in favor of the state, it is only necessary to determine when the relator's right to demand the refunding of this money accrued, as the statute would commence to run, if at all, at that time. The language of the statute under which this claim is made is as follows:

"Whenever the title of the people of this state to lands granted under its authority shall fail, and a legal claim for compensation on account of such failure shall be preferred by any person entitled thereto, it shall be the duty of the commissioners to direct the payment of the original purchase moneys which may have been paid to the state by such person, with interest at the rate of six per cent. from the time of such payment, to be paid out of the treasury on the warrant of the comptroller." 1 Rev. St. p. 198, § 6.

It is manifest that, under this provision of the statute, repayment of the money paid by Finch for these lands could not be claimed of

the state until the title of the state had been, by an order and decision of the comptroller, canceled, annulled, and set aside, which order was not made until the 29th day of March, 1892. From that time until the time of commencing these proceedings, the statute of limitations would not be a bar, as between individual citizens of the state; and, within the provisions of section 14 of article 7 of the state constitution, the state would not be entitled to avail itself of that defense, as the statute of limitations has not barred such claim.

The second objection to which my attention was directed by the attorney general, on behalf of the defendant, which seems to require examination, is the power of the relator, as the assignee of Finch, to make this motion, or demand and receive payment of the money in question. The validity of the transfer from Finch to the relator is not attacked on these proceedings either for fraud or insufficiency, and, under the proof, must be regarded as transferring to the relator all the title and interest in the subject in controversy to Harris. Upon the papers, therefore, he is the real party in interest, and would were this action between individuals, be the proper party to prosecute the same. But it is insisted that, owing to the peculiar wording of the statute which authorizes the payment of this money, the party who paid the same is only entitled to demand and receive repayment. While it is conceded that this is strictly a statutory remedy, and the statute giving the same must be strictly pursued, still we think the construction contended for is too restricted to be adhered to in the disposition of this question. Such a construction would cut off the rights of the personal representatives, executors, and administrators of Finch from claiming such repayment. The language of the statute is:

" * * * And a claim shall be preferred by any person entitled thereto, it shall be the duty of the commissioners to direct the payment of the original purchase moneys which may have been paid to the state by such person."

While a strict grammatical construction of the above phrase will justify the contention of the learned attorney general, I think it can hardly be maintained that the legislature intended to confine this remedy to the person paying the money exclusively, and bar the remedy to his personal representatives or assignees, and, in case of his death or assignment, forfeit the money which the state had received for lands sold by it to which it had no title. Such a construction would seem to be violative of the very principle of justice which must have been the motive of the legislature in providing for the payment of money paid to the state on void titles. This statute is remedial, and should, we think, be so construed as to effect the purpose for which it was enacted. That purpose was to enable the state, when it had received compensation for land sold by it, the title to which had failed, to refund to the person entitled thereto the money so received; and, as the state cannot be sued on such liability, the statute makes it the duty of the comptroller to declare the title defective and void, directs the commissioners of the land office to order the repayment, and the state treasurer to pay the same, on the warrant of the comptroller. But the ques-

tion has, we think, been settled upon authority, in People v. Chapin, 109 N. Y. 177, 16 N. E. 331. In that case, it is true, as claimed by the defendants, the question arose as to whether the original purchaser or his grantee was entitled to have the money refunded, but we do not see how that affects the question. The state conceded its liability to one of the claimants, and the court held that it must be paid to the grantee or assignee of the one who paid the money to the state in the first instance. It is also true that the statute under which that payment was made gave the right to the assignee, as well as the original purchasers from the state; but, as we have seen, the assignee takes the place of the assignor, and is the real party in interest in this case.

The remaining question which seems to demand consideration is whether the commissioners of the land office, in refusing to order the repayment of this money, acted judicially or ministerially. If the act of the commissioners was purely judicial, and involved only the exercise of judicial functions, then it is quite clear, upon authority, that the court cannot by mandamus reverse their judicial determination, and compel them to act in opposition to their judicial determination. If, on the contrary, the commissioners acted only as administrative or ministerial officers, then, if they failed in the performance of their ministerial duties, the court can. by the power of this writ, compel such performance. The difficulty, therefore, in the decision of this question upon this branch of the case, is in determining whether the act of the commissioners of the land office in denying the application for an order for repayment was a judicial or ministerial act. Under the distinction of the power and duties of state officers, the commissioners of the land office are classed as administrative officers, and are therefore clothed with no judicial functions, except such as may arise from the special duties which by statute they may be required to perform of a judicial character. While, perhaps, no special significance attaches to this fact, it is clear that the acts of these officers cannot be regarded as judicial, from the character of their office, unless they appear to be judicial in themselves. It is not every exercise of judgment by a ministerial or administrative officer or body that can be held to be the exercise of a judicial function or a judicial act. A sheriff is required to determine, at his peril, whether a process he is required to execute is fair upon its face, but such exercise of his judgment is not a judicial act. He is a ministerial officer, and acts as such in making such determination. Bouvier says: "A ministerial act may be defined to be one which a person performs in a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to or the exercise of his own judgment upon the propriety of the acts being done. Acts done out of court, in bringing parties into court, are, as a general proposition, ministerial." 2 Bouv. Dict. 237. It is quite apparent that the commissioners of the land office were not, in this case, required to exercise judicial functions, in the sense required to make their action judicial. The comptroller had determined that the title of the state had failed. That statute made it incumbent on the

commissioners to order the payment when the title of the state fails. There is no question raised by the papers as to the relator's title to the money in controversy, and that title is established by the assignment. In the absence of any question of fact in dispute in this case, it seems clear that the duty of the commissioners was ministerial, and that their refusal was not a judicial act which cannot be assailed on an application for a peremptory mandamus. We think, on the whole case, the relator is entitled to the writ of peremptory mandamus. Motion granted, with costs.